AO 91 (Rev. 08/09)  Criminal Complaint

# UNITED STATES DISTRICT COURT
### for the
Southern District of Florida

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| KENNETH CHATMAN, a/k/a "Kenny," JOAQUIN | ) | Case No.  16-8462-WM |
| MENDEZ, DONALD WILLEMS, FRANSESIA | ) | |
| DAVIS, a/k/a "Francine," a/k/a "Francesa," | ) | |
| MICHAEL BONDS, and LAURA CHATMAN, | ) | |
| *Defendant(s)* | | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ____9/2013 - 12/2016____ in the county of __Palm Beach and Broward__ in the
____Southern____ District of ____Florida____, the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 1349 | Conspiracy to commit health care fraud (all defendants) |
| 18 U.S.C. § 1035 | False statements related to health care matters (Defs. Kenneth Chatman and Laura Chatman) |

This criminal complaint is based on these facts:

See Attached Affidavit.

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Special Agent John Gerrity, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  12/20/2016

City and state:          West Palm Beach, FL

_____
*Judge's signature*

U.S. Magistrate Judge William Matthewman
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Special Agent John Gerrity, being duly sworn, do hereby and depose and state:

### Affiant's Background

1.      I am a Special Agent with the Federal Bureau of Investigation (FBI), currently assigned to the Miami Division, Palm Beach County Resident Agency.  I have been employed with the FBI since January 2016.  Prior to becoming a Special Agent, I practiced law for approximately five years.  I am presently assigned to investigate a wide-variety of health care fraud matters, including schemes to defraud private insurance companies.  I have received training from the FBI on matters related to health care fraud investigations and have attended multiple conferences and seminars on conducting health care fraud investigations. In addition to health care fraud, I am also presently assigned to investigate human trafficking matters.

2.      I am personally involved in conducting a joint investigation with other Federal, State, and Local law enforcement agencies into alleged criminal activities perpetrated by JOURNEY TO RECOVERY, LLC ("JOURNEY") and REFLECTIONS TREATMENT CENTER, LLC ("REFLECTIONS") (collectively known as "the SUBJECT FACILITIES"), which are addiction treatment facilities; the owners, KENNETH CHATMAN, a/k/a "Kenny," and LAURA CHATMAN (collectively known as the "CHATMANS"); and other staff members, medical doctors, and halfway house/sober home owners, employed by and associated with the SUBJECT FACILITIES, including but not limited to JOAQUIN MENDEZ, DONALD WILLEMS, FRANSESIA DAVIS, a/k/a "Francine," a/k/a "Francesa," and MICHAEL BONDS. The statements contained in this Affidavit are based upon a review of public and private records, interviews, and other investigative activities conducted by law enforcement personnel assigned to this case.

3.      This Affidavit is being submitted in support of a Criminal Complaint charging KENNETH CHATMAN, JOAQUIN MENDEZ, DONALD WILLEMS, FRANSESIA DAVIS, MICHAEL BONDS, and LAURA CHATMAN with conspiracy to commit health care fraud, in violation of 18 U.S.C. § 1349, and charging KENNETH CHATMAN and LAURA CHATMAN with making false statement related to health care matters, in violation of 18 U.S.C. § 1035. Because this Affidavit is provided for the limited purpose of establishing probable cause for a Criminal Complaint, I have not included all information known to me regarding this investigation, but rather have set forth only those facts necessary to establish probable cause to believe that the defendants have committed the charged offenses.

## The Treatment Centers

4.      Journey to Recovery LLC ("JOURNEY") was located at 7451 S. Military Trail, Lake Worth, Florida, in Palm Beach County.  JOURNEY purported to operate as a licensed "substance abuse service provider" or "treatment center," that is, it purportedly offered clinical treatment services for persons suffering from alcohol and drug addiction.  Defendant LAURA CHATMAN was listed as the sole owner of JOURNEY on the corporate records filed with the State of Florida and the licensing documents filed with the Department of Children and Families.

5.      Reflections Treatment Center, LLC ("REFLECTIONS") was located at 5100 Coconut Creek Parkway, Margate, Florida, in Broward County.  REFLECTIONS purported to operate as a licensed "substance abuse service provider" or "treatment center," that is, it purportedly offered clinical treatment services for persons suffering from alcohol and drug addiction.  Defendant LAURA CHATMAN was listed as the sole owner of REFLECTIONS on the corporate records filed with the State of Florida and the licensing documents filed with the Department of Children and Families.

## The Defendants

6.     Defendant KENNETH CHATMAN, a/k/a "Kenny," was the true owner of REFLECTIONS and JOURNEY, managing all aspects of the treatment centers, including hiring and firing personnel, admitting and discharging patients, and making financial decisions. KENNETH CHATMAN, a/k/a "Kenny," had a felony conviction which made him ineligible to own, operate or serve as personnel at a licensed substance abuse service provider. KENNETH CHATMAN, a/k/a "Kenny," was also the true owner of a series of "sober homes," including Stay'n Alive, and Total Recovery, managing all aspects of the sober homes, including hiring and firing personnel, selecting and evicting residents, and making financial decisions.

7.     Defendant JOAQUIN MENDEZ, a licensed medical doctor in the State of Florida, was the medical director of REFLECTIONS from January to July, 2014, and from September 2014, to September 2015.  As medical director, MENDEZ was purportedly responsible for evaluating patients, developing appropriate plans of treatment, and prescribing medically necessary treatment and testing.

8.     Defendant DONALD WILLEMS, a licensed osteopathic doctor in the State of Florida, was medical director of REFLECTIONS from October 2015 to May 2016.  As medical director, WILLEMS was purportedly responsible for evaluating patients, developing appropriate plans of treatment, and prescribing medically necessary treatment and testing.

9.     Defendant FRANSESIA DAVIS, a/k/a "Francine," a/k/a "Francesa," was an employee at REFLECTIONS and the nominee owner of the sober home named Total Recovery. DAVIS managed Total Recovery for KENNETH CHATMAN, the true owner.

3

10.     Defendant MICHAEL BONDS owned and operated the sober home named Redemption Sober House, Inc. ("Redemption"), which was located at 243 NE 13th Street, Delray Beach, Florida, in Palm Beach County.

11.     Defendant LAURA CHATMAN is the wife of KENNETH CHATMAN and a nominee owner of JOURNEY, REFLECTIONS, and Stay'n Alive.  She was a signatory on the bank accounts for these companies and signed many of the checks issued on these accounts. LAURA CHATMAN signed and filed applications for licensure and was present at the JOURNEY and REFLECTIONS offices during regulatory inspections and audits.

**Background on Drug and Alcohol Rehabilitation**

12.     In recent years, South Florida, particularly Palm Beach and Broward Counties, have become destinations for drug and alcohol addicts seeking assistance in becoming and remaining sober.  News reports estimate treatment for substance abuse is Palm Beach County's fourth largest industry, with revenues in excess of $1 billion per year.  Substance abuse treatment is regulated under state and federal law, which describe a continuum of care including, from most intensive to least intensive, inpatient detox, partial hospitalization programs ("PHP"), intensive outpatient programs ("IOP"), and outpatient programs ("OP").  Some persons undergoing treatment on an outpatient basis, whether in PHP, IOP, or OP, will elect to live in a "recovery residence," also known as a "sober home" or "halfway house," with other persons who are also in treatment and committed to a drug and alcohol-free lifestyle.

13.     Detox is meant for individuals who are still addicted to and using controlled substances and/or alcohol.  Detox facilities are inpatient facilities where patients are assisted in dealing with the effects of withdrawal from the complete cessation of using drugs and/or alcohol. After successfully completing detox, patients receive treatment for their underlying addiction in

4

the form of outpatient care, either through PHPs, IOPs, and OPs. PHP, IOP, and OP patients attend facilities on an ongoing basis where clinical and medical treatment is rendered. The distinction between the three relates to the amount of clinical treatment (i.e., therapy) received on a daily or weekly basis, and patients generally transition from detox to PHP, then to IOP, and finally to OP as they overcome their addiction.

14.     To ensure the legitimacy of substance abuse service providers and to protect the health and welfare of patients, all substance abuse service provider personnel, including all owners, directors, and chief financial officers, had to pass a "level 2 background screening," including "fingerprinting for statewide criminal history records checks through the Department of Law Enforcement, and national criminal history records checks through the Federal Bureau of Investigation." Fl. Stat. §§ 397.451(1)(a)(1), 435.04(1)(a) 435.04(2). Licensing in the State of Florida is handled by the Florida Department of Children & Families ("DCF").

15.     As noted above, KENNETH CHATMAN has a prior federal felony conviction for access device fraud which makes him ineligible to own a substance abuse treatment facility or to serve as an officer or employee who has patient contact. To avoid DCF's licensing requirement, LAURA CHATMAN, with the assistance of KENNETH CHATMAN, and others, submitted applications and other documentation to DCF wherein she purported to the be the sole owner, CEO, and CFO of JOURNEY and REFLECTIONS and omitted any mention of KENNETH CHATMAN. LAURA CHATMAN also submitted false sworn declarations certifying that all officers and employees with access to patients passed a background check.

<u>Federal Guidelines for Substance Abuse Treatment</u>

16.     The U.S. Department of Health and Human Services, Substance Abuse and Mental Health Services Administration, Center for Substance Abuse Treatment ("SAMHSA"),

promulgated guidelines for substance abuse treatment. Those guidelines referred to varying levels of treatment provided based on the severity of the addiction, including, for purposes of this Affidavit, detox, PHP, IOP, and OP.

17.     According to SAMHSA's Guidelines, detoxification is a set of interventions aimed at managing acute intoxication and withdrawal. It denotes a clearing of toxins from the body of the patient who is acutely intoxicated and/or dependent on substances of abuse. Detoxification seeks to minimize the physical harm caused by the abuse of substances.

18.     PHPs (as defined by SAMHSA) are formal substance abuse treatment programs that provide services to clients with mild to moderate symptoms of withdrawal that are not likely to be severe or life-threatening and that do not require 24-hour medical support. PHPs are considered a "step down" from an inpatient detoxification program. Clients attending PHPs are supposed to participate in 30 or more hours of treatment per week, often provided in at least six hour-long sessions per day, for five days per week. Clients who successfully complete a PHP program should transition to IOP.

19.     According to SAMHSA's Guidelines, IOPs were formal substance abuse treatment programs that adhered to a set of formal guidelines. IOPs had to be overseen by a qualified professional. Clients had to receive a thorough evaluation to determine the stage and severity of their illness, including medical and mental disorders. Qualified medical personnel were to assign clients to a formal treatment plan. The IOP was accountable for the treatment or referral of the client to additional services as necessary. The IOP was obligated to maintain contact with the client until recovery was completed. SAMHSA's Guidelines recommended that IOPs provide at least nine hours of treatment per week, typically in three, 3-hour sessions. Clients at IOPs also were supposed to attend at least one 30-60 minute individual counseling session per week.

20.     In addition to substance abuse treatment programs, SAMHSA promulgated guidelines for sober homes.  Sober homes generally did not provide medical care or clinical services to their residents.  When properly managed, sober homes operated as alcohol and drug free living environments for individuals attempting to abstain from alcohol and drugs, including providing a peer support network of individuals in recovery.

<u>Substance Abuse Treatment in Florida</u>

21.     Substance abuse services in Florida were governed by the "Hal S. Marchman Alcohol and Other Drug Services Act" ("the Marchman Act"), which recognized that "[s]ubstance abuse impairment is a disease which affects the whole family and the whole society and requires a system of care that includes prevention, intervention, clinical treatment, and recovery support services that support and strengthen the family unit."  Fl. Stat. §§ 397.301, 397.305(1).

22.     The Marchman Act was enacted to provide for a "comprehensive continuum of accessible and quality substance abuse prevention, intervention, clinical treatment and recovery support services in the least restrictive environment which promotes long-term recovery while protecting and respecting the rights of individuals."  Fl. Stat. § 397.305(3).  The "comprehensive continuum of accessible and quality . . . clinical treatment services," included, for purposes of this affidavit, "day or night treatment" (equivalent to SAHSA's "PHP"), intensive outpatient treatment, and outpatient treatment.  Fl. Stat. § 397.311(a).

23.     Regardless of which category of service was provided, every type of "clinical treatment" needed to be "a professionally directed, deliberate, and planned regimen of services and interventions that are designed to reduce or eliminate the misuse of drugs and alcohol and promote a healthy, drug-free lifestyle."  Fl. Stat. § 397.311(a).

7

24.    In addition to substance abuse service providers, the Marchman Act provided guidelines for sober homes/recovery residences, which were defined as "a residential dwelling unit, or other form of group housing that is offered or advertised . . . as a residence that provides a peer-supported, alcohol-free, and drug-free living environment." Fl. Stat. § 397.311(36).

<u>Payment for Substance Abuse Treatment and Testing</u>

25.    The SUBJECT FACILITIES and a series of external laboratories submitted claims for reimbursement to more than forty health benefit plans, including Federal Employees Health Benefits Program ("FEHBP") plans, health plans sponsored by private employers (including the National Railroad Passenger Corporation ("Amtrak"), and private ERISA and non-ERISA health benefit plans (jointly referred to as "the Insurance Plans"). Blue Cross Blue Shield ("BCBS") was the insurance company that handled the most claims submitted by the SUBJECT FACILITIES.

26.    The Insurance Plans were "health care benefit programs," as defined in Title 18, United States Code, Section 24(b), that is "public or private plans or contracts, affecting commerce, under which any medical benefit, item or service is provided to any individual."

27.    Regardless of the type of Insurance Plan held by a patient, the amount of coverage and terms and conditions of billing and payment were governed by the terms of the patient's insurance documents, and the insurance company administering the plan had the authority, responsibility, and discretion to make coverage determinations and to process and make payments on claims. The Insurance Plans all cover substance abuse treatment and testing costs in accordance with the terms of their policies and state and federal law, including requirements that testing and treatment be medically necessary and actually rendered, provided by properly licensed facilities, and provided in accordance with the terms of the Insurance Plans' contracts, including the requirement to collect co-pays and deductibles.

28.     Bodily fluid testing could be used to detect recent drug or alcohol use by a client by conducting various tests on a client's urine, blood, and saliva.  Urine Analysis or urinalysis ("UA") testing complexity ranged from screening tests – also known as point of care ("POC") testing – which provided instant results, to confirmatory testing, which was sent to a laboratory, for more complex analysis.  Laboratories could also conduct complex analysis on blood and saliva samples.

29.     Like other medical tests, bodily fluid testing could be billed and reimbursed in accordance with the terms of the insurance policy.  Insurance carriers were only responsible for claims for testing that were "medically necessary," actually performed, prescribed, and conducted by a properly licensed service provider, and conducted and billed in compliance with the terms of the health care plan, including the obligation to pay co-insurance.

30.     Point of care "POC" qualitative urine testing involved collecting a client's urine in a specific cup designed for testing.  The specimen was analyzed using a color banded or numbered dipstick, allowing for visual positive or negative results.  The POC urine testing usually tested for the presence of 9 to 13 specific classes of drugs, including the most common drugs of abuse such as cocaine, opioids, marijuana, and heroin.  POC tests typically cost between $5 and $10 and could be read easily by a layperson.

31.     Confirmatory testing, conducted in a laboratory setting, made use of gas liquid chromatography, mass spectrometry, and/or gas chromatography, or high performance liquid chromatography, to analyze the client's urine, blood, or saliva specimen.  These techniques were highly sensitive, and accurately and definitively identified specific substances and the quantitative concentrations of the drugs or their metabolites.  Confirmatory testing could detect a wider range of controlled substances and metabolites – up to 100 or more substances, referred to as "panels."

The prescribing physician could request that the laboratory test only for those panels that directly related to a client's drug use history. Laboratories billed each panel separately, so prescribing more panels for testing resulted in higher bills.

32.     The Insurance Plans provided guidance to service providers, including physicians, substance abuse treatment centers, and laboratories, for the types and frequency of testing that would be reimbursable. This guidance was based upon policy statements from the American Society of Addiction Medicine ("ASAM"), publications by expert researchers in the area of substance abuse treatment, and policies of federal and state governmental agencies. For example, Blue Cross/Blue Shield ("BCBS") issued guidance on November 15, 2013, stating that, in certain circumstances, drug screening tests could be used in connection with substance abuse treatment where a patient is suspected of drug misuse and there was a suspicion of continued substance abuse. Drug screening tests were not medically necessary, however, where simultaneous blood and urine testing was occurring or where testing was merely a routine part of a physician's treatment protocol.

33.     In 2014, BCBS provided more specific guidance that categorized urine drug testing into two categories. "Immunoassay testing" (also referred to as qualitative testing or screening tests") could be performed either in a laboratory or at a point of service and reported positive or negative results for classes of drugs, rather than individual drugs within that class. "Specific drug identification" (also known as quantitative testing or confirmatory testing) could only be performed in a laboratory and usually involved the use of gas chromatography/mass spectrometry. Quantitative/confirmatory tests could quantify the amount of drug or metabolite present in a urine sample and could be used to confirm the presence of a specific drug that could not be isolated via immunoassay testing.

10

34.     BCBS provided that, in an outpatient substance abuse treatment setting, in-office qualitative urine drug testing meets the definition of medical necessity under the following conditions: (1) baseline screening before initiating treatment or at the time treatment was initiated, one time per program entry, when a clinical assessment of patient history and risk of substance abuse was performed, the clinicians had knowledge of test interpretation, and there was a plan in place regarding how to use test finding clinically; (2) during the stabilization phase of treatment, targeted weekly qualitative screening was appropriate for a maximum of 4 weeks; and (3) during the maintenance phase, targeted qualitative screening was appropriate once every 1 to 3 months. Qualitative urine drug testing was limited to fifteen (15) tests within a 12-month period.

35.     BCBS further provided that quantitative/confirmatory urine drug testing met the definition of medical necessity only when immunoassays for the relevant drugs were not commercially available or in specific situations for which quantitative drug levels were required for clinical decision making such as where an unexpected positive test was inadequately explained by the patient, there was an unexpected negative result for prescription medication, or there was a need for quantitative levels to compare with established benchmarks. Quantitative/confirmatory urine drug testing was limited to twelve (12) tests within a 12-month period.

36.     BCBS specified that urine drug testing (whether qualitative or quantitative/confirmatory) did not meet the definition of medical necessity in the case of: (1) routine qualitative or quantitative urine drug testing (e.g., testing at every visit, without consideration for specific patient risk factors or without consideration for whether quantitative testing was required for clinical decision making); (2) quantitative testing instead of qualitative testing or as a routine supplement to qualitative testing; (3) simultaneous blood and urine specimen

11

testing; and (4) testing for residential monitoring.  Furthermore, oral fluid (i.e., saliva) drug testing was considered experimental or investigational and was not covered.

37.    To bill insurance companies for substance abuse treatment and bodily fluid testing, substance abuse treatment facilities and labs submit paper and electronic claims using a number of standardized forms, including the "CMS-1450," the "CMS-1500," and the "HCFA-1500". ("CMS" refers to the Centers for Medicare and Medicaid Services, and "HCFA" refers to the Health Care Financing Administration, the predecessor to CMS.)  Regardless of the form used, by submitting a claim, the provider is certifying that the treatment or lab service was medically necessary and actually rendered, and the provider is warned that providing false, incomplete, or misleading information can result in civil and criminal penalties.  Before billing for lab tests, providers must first obtain a prescription from the patient's medical doctor, who must deem the test medically necessary.

38.    Unlike treatment facilities, sober homes generally do not provide medical care or clinical services to their residents, but operate solely as group residences where residents can live with a support network of others in recovery.  Since sober homes are merely places to live, they generate income to cover expenses through the collection of weekly or monthly rent paid by their residents, just as with any other landlord-tenant relationship.

<u>Florida's Prohibition on Patient Brokering, Kickbacks, and Failing to Collect Co-Insurance</u>

39.    Patient brokers or marketers are individuals who recruit patients and direct them to a particular treatment facility in exchange for a fee or some type of compensation.

40.    The "Florida Patient Brokering Act" makes it unlawful for any person, including any health care provider, health care facility, or substance abuse treatment facility, to:

(a) Offer or pay any commission, bonus, rebate, kickback, or bribe, directly or indirectly, in cash or in kind, or engage in any split-fee arrangement, in any form

whatsoever, to induce the referral of patients or patronage to or from a health care provider or health care facility; (b) Solicit or receive any commission, bonus, rebate, kickback, or bribe, directly or indirectly, in cash or in kind, or engage in any split-fee arrangement, in any form whatsoever, in return for referring patients or patronage to or from a health care provider or health care facility; (c) Solicit or receive any commission, bonus, rebate, kickback, or bribe, directly or indirectly, in cash or in kind, or engage in any split-fee arrangement, in any form whatsoever, in return for the acceptance or acknowledgement of treatment from a health care provider or health care facility; or (d) Aid, abet, advise, or otherwise participate in the conduct prohibited under paragraph (a), paragraph (b), or paragraph (c).

Fla. Stat. § 817.505.

41.     Florida law also states that it "shall constitute a material omission and insurance fraud . . . for any service provider, other than a hospital, to engage in a general business practice of billing amounts as its usual and customary charge, if such provider has agreed with the insured or intends to waive deductibles or copayments, or does not for any other reason intend to collect the total amount of such charge." Fl. Stat. § 817.234(7)(a).

<u>The Charged Offenses</u>

42.     Federal law makes it a crime for anyone to knowingly or willfully execute or attempt to execute a scheme or artifice: (1) to defraud any health care benefit program or (2) to obtain by means of false or fraudulent pretenses, representation, or promises, any of the money or property owned by or under the custody or control of a health care benefit program, in connection with the delivery of or payment for health care benefits, items, or services. 18 U.S.C. § 1347(a). Conspiracies and attempts to commit health care fraud also are violations of federal law. 18 U.S.C. § 1349.

43.     To be convicted of health care fraud, one need not have actual knowledge of 18 U.S.C. § 1347(a) or the specific intent to violate it. 18 U.S.C. § 1347(b).

44.     Title 18, United States Code, Section 1035, makes it a crime for anyone, in any matter involving a health care benefit program, to knowingly and willfully (1) falsify, conceal, or

cover up by any trick, scheme, or device a material fact; or (2) make any materially false, fictitious, or fraudulent statements or representations, or make or use any materially false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry, in connection with the delivery of or payment for health care benefits, items, or services.

<u>The Defendants' Involvement in Health Care Fraud and False Statements</u>

45.     Defendant KENNETH CHATMAN first came to the attention of the FBI in September 2013, when Palm Beach Police Department investigators related to the FBI information provided by two patients of NEW HOPE TREATMENT CENTER, which was owned and/or operated by KENNETH CHATMAN, LAURA CHATMAN, and their associates.  Although they were purportedly receiving substance abuse treatment, the patients described being provided drugs by KENNETH CHATMAN and others at a "sober home" located at 962 W. 43rd Street, West Palm Beach, Florida.  They also stated that since they were provided with drugs, they were unable to pass mandatory UA tests.  Employees of NEW HOPE would themselves provide urine for the tests.  Additionally, billing of the patients' insurance companies for therapy continued, even though no therapy was provided.

46.     In 2015 and 2016, "Confidential Witness 1" (CW1) provided information to agents of the FBI and investigators of the Palm Beach County Sheriff's Office and Palm Beach Police Department regarding her interactions with KENNETH CHATMAN and his co-conspirators, as follows.  CW1 explained that she had been in rehabilitation for addiction to heroin.  She resided in one of several sober homes operated and functionally owned by KENNETH CHATMAN.  CW1 reported that KENNETH CHATMAN and LAURA CHATMAN also own REFLECTIONS, where many residents of his sober homes attended IOP.  CW1 stated that drug use was not only permitted, but was encouraged at the "sober home" owned by KENNETH CHATMAN.

47.     CW1 related to agents of the FBI that she attended IOP sessions at REFLECTIONS. CW1 was told by KENNETH CHATMAN and his associates that she had to sign to verify that she had received treatment that she had in fact not received, including treatment from an on-site medical doctor, or would be required to leave the program. CW1 provided written consent to the FBI to obtain her medical and insurance records.

48.     The FBI obtained CW1's records in accordance with her consent. A review of those records corroborated CW1's statements. In particular, although CW1 was only at REFLECTIONS for one day, the records show that three days of service were purportedly rendered and two urinalysis tests were purportedly performed.

49.     On July 15, 2015, CW2 related to agents of the FBI that he had been an employee of REFLECTIONS. CW2 corroborated CW1's statements that REFLECTIONS billed for therapy and urine analysis (UA) for days on which patients were not present. One of CW2's responsibilities was to conduct head counts for therapy sessions, which often did not match the number of patients ultimately billed for therapy and UAs.

50.     On November 21, 2016, CW3 related to agents of the FBI that she attended IOP sessions at REFLECTIONS and resided at sober homes managed by DAVIS. CW3 was moved by KENNETH CHATMAN into a "female-only" residence located at 1130 48th Street, Mangonia Park, Florida. CW3 and the other females were not allowed out of the house, as the doors were locked and the windows were screwed down. DAVIS was the manager of the house and told the residents, including CW3, that KENNETH CHATMAN would not allow them to leave. KENNETH CHATMAN visited the house, and took and kept all of the female residents' possessions, including cell phones. CW3 could only speak with her family in New Jersey when KENNETH CHATMAN or DAVIS was listening in on the conversation. CW3 was told by

15

KENNETH CHATMAN that she would not have to pay rent and would not have to participate in treatment or testing so long as she agreed to engage in prostitution and allowed KENNETH CHATMAN to bill her insurance for treatment and testing as though she had received those services. CW3 further reported that, while living in the female-only residence, she did not receive treatment or provide urine for lab testing.

51.     Your Affiant has reviewed EMR and insurance records relating to CW3. Despite the fact that CW3 was not allowed to leave the residence, medical records and insurance claims were created that made it appear that CW3 was attending treatment and receiving testing. These claims were submitted by REFLECTIONS to CW3's insurance plan for reimbursement.

52.     On November 15, 2016, CW4 related to agents of the FBI that he had been an employee of REFLECTIONS for approximately 12 months from 2015 to 2016. CW4 personally observed employees of REFLECTIONS providing their own bodily fluids for confirmatory testing. CW4 walked into a room used for UA testing and observed DAVIS taking saliva swabs, putting them into her mouth, and then placing them into bags containing the medical record face sheets of patients. These bags were then given to a representative for a laboratory that did confirmatory testing for REFLECTIONS.

53.     CW4 also related to agents that when the "census" at REFLECTIONS got low (i.e., there were fewer patients than average), KENNETH CHATMAN made DAVIS and other employees "pee" for patients who were no longer in treatment at REFLECTIONS. One of the employees confided in CW4 that KENNETH CHATMAN told her to provide urine for patients and that her job depended on it.

54.     On November 18, 2016 and November 30, 2016, agents interviewed two current employees of REFLECTIONS. During the interviews, both employees admitted to providing

urine samples for patients on multiple occasions at the direction of KENNETH CHATMAN and that those urine samples were submitted to labs as though they came from patients.

55.     On December 1, 2016, CW5 related to agents of the FBI that he had been a patient at REFLECTIONS from February 2016 until September 2016 while residing at sober homes located at 5611 Pinetree Road, Parkland, Florida, and 315 SW 7th Avenue, Boynton Beach, Florida.  On multiple occasions, REFLECTIONS employees submitted bodily fluid drug tests to be billed to CW5's insurance that were not CW5's saliva and/or urine.  One such occasion included a date on which CW5 was not physically at REFLECTIONS because he was in court.  CW5 reported that KENNETH CHATMAN directed an employee to submit a "relapse" to CW5's insurance company, that is, a report that CW5's UA showed recent drug use.  The purpose of submitting this "relapse" to CW5's insurance was to obtain authorization to move CW5 to a higher level of care so that REFLECTIONS could bill his insurance for IOP five days a week rather than three days a week. In fact, CW5 had not relapsed or used drugs; the UA was run on someone else's urine, and CW5's insurance was billed even though the test was not run on CW5's urine.

56.     CW5 and CW7, another REFLECTIONS patient, also stated that, in exchange for referring CW5 and CW7 to REFLECTIONS, KENNETH CHATMAN paid kickbacks to the owners of the sober homes where CW5 and CW7 were residing and, in turn, CW5 and CW7 received a discount on their rent.

57.     A former employee of REFLECTIONS, CW6, related to agents on November 15, 2016 that KENNETH CHATMAN would keep patients' cell phones, food stamps, car keys and belongings. KENNETH CHATMAN would keep client possessions in his office in order to control the patients and keep them from contacting parents or others who could help them leave the facility.  If the patients attempted to leave, KENNETH CHATMAN would order DAVIS or other

employees to destroy the cell phones.  Other witnesses, including CW2, CW5, and CW7, another former patient at REFLECTIONS, reported the same pattern of taking and keeping patient cell phones, medications, and belongings in order to force the patients to continue receiving treatment at REFLECTIONS which, in turn, could be billed to their insurance policies.

58.     CW6 also described to agents that, after patients left REFLECTIONS, KENNETH CHATMAN repeatedly instructed CW6 to bill the departed patients' Insurance Plans for testing and treatment that never occurred.  These false claims were submitted to the Insurance Plans for reimbursement for services that were never rendered.

59.     Interviews with former employees and patients, and a review of financial records show that KENNETH CHATMAN, FRANCINE DAVIS, MICHAEL BONDS, LAURA CHATMAN, and others engaged in a practice of paying kickbacks and bribes to insured patients for receiving treatment and testing at the SUBJECT FACILITIES and KENNETH CHATMAN, LAURA CHATMAN, and others engaged in a practice of paying kickbacks and bribes sober home owners to induce referrals of insured patients to the SUBJECT FACILITIES to receive treatment and testing.

60.     Witnesses, including employees and patients, reported that KENNETH CHATMAN made payments in cash and checks to sober home owners of $500 to $525 per week per *insured* patient that was referred to the SUBJECT FACILITIES for treatment.  The sober homes, in turn, would provide rent abatements to the insured residents for whom KENNETH CHATMAN had provided kickbacks.  In addition to the rent abatements, KENNETH CHATMAN provided cigarettes, hair services, nail services, gift cards, and drugs to patients to induce them to allow KENNETH CHATMAN to bill their insurance companies for treatment.

61.     For example, several employees of the SUBJECT FACILITIES reported that KENNETH CHATMAN met on a weekly basis with sober home owners to provide kickbacks and bribes, disguised as "case management fees," for referring the residents of the sober homes to REFLECTIONS and JOURNEY for treatment that was billed to the residents' insurance plans. B.G., a cooperating defendant, reported that he had spoken with several sober home owners who confirmed that KENNETH CHATMAN was paying $500-$525 per week for each insured patient who attended IOP.

62.     Defendant BONDS owned Redemption, one of the sober homes that referred patients to REFLECTIONS in exchange for money.  More than $100,000 was paid to BONDS in checks drawn on the REFLECTIONS bank account, plus an unknown amount of cash.  Defendant DAVIS also received payments for agreeing to be the nominee owner and manager of sober homes that referred patients to the SUBJECT FACILITIES for treatment.  In total, bank records show that more than $640,000 in checks were drawn on the REFLECTIONS bank account and paid to sober home owners.

63.     In addition to receiving kickbacks for referrals, BONDS and DAVIS allowed residents of their sober homes to use drugs and knew that their residents were continuing to use drugs while attending REFLECTIONS.  BONDS and DAVIS also provided rent rebates to residents whom they referred to REFLECTIONS and knew that KENNETH CHATMAN was causing claims for excessive urine testing to be billed to their residents' insurance plans.

64.     A review of corporate records, police reports, regulatory records, bank records, witness interviews, the REFLECTIONS website, and surveillance conducted by the FBI and other law enforcement agencies has resulted in the identification of several sober homes throughout Palm Beach and Broward Counties that KENNETH CHATMAN and his associates have, currently

19

and in the past, operated.  These sober homes show ownership in the names of REFLECTIONS,

STAY'N ALIVE, INC., and under other associates' names.  These sober homes were typically

located in residential neighborhoods and were generally rental homes.  The sober homes have in

the past been relocated to avoid law enforcement, because the group was evicted, or for other

reasons.  Some of the sober homes used business names and others were simply addresses where

patients of REFLECTIONS and JOURNEY have been known to reside, including:

- Total Recovery Sober Living, 3401 Westview Avenue, West Palm Beach, Florida ("Total Recovery")

- Redemption Sober House, Inc., 243 NE 13th Street, Delray Beach, Florida ("Redemption")

- Stay'N Alive, Inc., 10102 Patience Lane, Royal Palm Beach, Florida

- 962 West 43rd Street, West Palm Beach, Florida

- 315 SW 7th Avenue, Boynton Beach, Florida

- 5611 Pinetree Road, Parkland, Florida

65.     While fraudulent claims for the PHP, IOP, and OP resulted in the generation of

significant proceeds, claims for lab testing, including confirmatory urine testing and saliva testing

generated far more money.

66.     CW8 worked as a representative for two of the laboratories ("Lab #1" and "Lab

#2") that performed bodily fluid testing on patients at the SUBJECT FACILITIES.   CW8

personally provided gifts to KENNETH CHATMAN as kickbacks and bribes for referring bodily

fluid testing to Lab #1 and Lab #2.  In addition, CW8 learned from KENNETH CHATMAN that

a third lab ("Lab #3") was providing cash payments to KENNETH CHATMAN totaling $100,000

each month in exchange for sending bodily fluid specimens to Lab #3.  KENNETH CHATMAN

showed CW8 a bag containing $100,000 cash that KENNETH CHATMAN had received from Lab #3.

67.     KENNETH CHATMAN also told CW8 about a deal with a fourth lab ("Lab #4"), in which Lab #4 paid KENNETH CHATMAN $10,000 to $30,000 cash per week in exchange for sending bodily fluid specimens to Lab #4.  The amount varied based upon the number of specimens that KENNETH CHATMAN submitted to Lab #4.  KENNETH CHATMAN told CW8 that Lab #4 had a driver go to the Florida Keys to cash checks and then a driver would deliver the cash to KENNETH CHATMAN.

68.     Another confidential witness, CW9, who had been a former business partner of KENNETH CHATMAN, also reported that Lab #4 had entered into an agreement with KENNETH CHATMAN and CW9 providing kickbacks to KENNETH CHATMAN and CW9 that were disguised as dividends on shares that KENNETH CHATMAN and CW9 had purchased in Lab #4.  CW9 explained that this was simply a disguised kickback because the amount of "shares" that they were allowed to buy was based directly on the amount of samples that REFLECTIONS promised to send to Lab #4, and the "dividends" were calculated based upon the number of samples submitted in a given week.

69.     CW8 also related to agents that KENNETH CHATMAN liked dealing in cash because it did not leave a paper trail.  As examples, CW8 described how KENNETH CHATMAN paid for the patients in cash and kept a safe in his home where he secured cash.

70.     Defendants JOAQUIN MENDEZ and DONALD WILLEMS, at the direction of KENNETH CHATMAN, wrote "standing orders" for routine confirmatory testing of all patients, including patients whom they had not yet examined.  These standing orders included duplicate saliva and urine tests.  A review of the electronic medical records related to these bodily fluid tests

showed that the test results were not reviewed by MENDEZ and WILLEMS until weeks or months after the testing was conducted – many times not until the patients had already left the facilities. The results also were reviewed so quickly that it would be impossible for a substantive review to have taken place. For example, on one date beginning at 10:11 p.m., MENDEZ signed hundreds of electronic medical records affirming that he had reviewed the test results. This "review" came one day after MENDEZ received a check for $7,500 from REFLECTIONS.

71. For example, the EMR file of one patient who attended REFLECTIONS for approximately 10 days in February and March 2015, contains a lab testing order for a "comprehensive panel" of urine testing and a separate lab testing order for "Drug Test 19 – Saliva" that were signed by Defendant MENDEZ. Both tests show a "start date" of July 24, 2015 and an "end date" of February 23, 2015 – *i.e.,* the lab testing was ordered more than five months *after* the testing occurred and more than four months *after* the patient left REFLECTIONS. On that same date – July 24, 2015 – Defendant MENDEZ provided the identical "Medical Necessity Statement" for both tests. The statement, which was entered by REFLECTIONS' intake coordinator (a relative of the CHATMANS) and read back to and verified by MENDEZ, provided:

> [xx] year old male Client presenting with 304.40 Amphetamine-type substance use disorder and Severe. *Urine* drug testing is medically necessary for diagnostic, clinical, and therapeutic purposes, to detect the use of prescription medications and illegal substances of concern for the purpose of assessment and treatment and to monitor compliance with the medication protocol of the Program.

(Emphasis added; age redacted pursuant to 42 U.S.C. § 290dd-2.) The same "Medical Necessity Statement" was included in dozens of patient files on the same date purporting to justify both urine and saliva testing after the fact. On July 23, 2015, LAURA CHATMAN signed a check made payable to Care MD, LLC, a business owned by MENDEZ.

72.     Similarly, CW8 reported that WILLEMS would sign standing orders for lab testing for patients whom WILLEMS had never even seen.  WILLEMS also signed "Medical necessity statements" like the one quoted above knowing that the tests had already been performed.

73.     B.G., CW5, and CW7 also described how patients were forced to submit to allergy testing that they neither needed or requested.  CW5 and CW7 were never even provided the results of the allergy testing but claims for the testing were submitted to their Insurance Plans.  A witness reported to agents that he heard KENNETH CHATMAN discussing blood testing with a lab rep who told KENNETH CHATMAN that he could receive a kickback of $2,000 per blood test.

74.     Interviews with witnesses and patients, as well as correspondence, bank records, and reports of KENNETH CHATMAN's interactions with law enforcement show that KENNETH CHATMAN, in fact, owns and operates JOURNEY and REFLECTIONS.   KENNETH CHATMAN has repeatedly stated to law enforcement agents that he is REFLECTIONS' owner, and employees and patients have reported that KENNETH CHATMAN made all the decisions at the SUBJECT FACILITIES – including overruling admission, treatment, and discharge decisions made by clinical staff and interrupting treatment sessions.  LAURA CHATMAN, on the other hand, was rarely present at the SUBJECT FACILITIES but appeared during DCF audits and inspections to make it appear that she owned and operated the SUBJECT FACILITIES.

75.     KENNETH CHATMAN has held himself out publicly as the owner of the SUBJECT FACILITIES.  For example, KENNETH CHATMAN identified himself as the owner of REFLECTIONS to US Customs & Border Protection ("CBP") upon re-entry to the United States from Mexico on November 20, 2016.  When questioned by CBP regarding his occupation, KENNETH CHATMAN stated that he was the owner of REFLECTIONS and stated that LAURA

CHATMAN was a "stay at home mom."  KENNETH CHATMAN is also a signor and owner on business bank accounts for REFLECTIONS and JOURNEY.

76.     Agents interviewed B.G. on several occasions.  B.G. initially began working for KENNETH CHATMAN as a consultant.  B.G.'s consulting services included helping addiction treatment facilities and sober homes obtain the appropriate DCF licensure or registration with the Florida Association of Recovery Residences.  B.G. assisted KENNETH CHATMAN with getting DCF licenses for JOURNEY and REFLECTIONS, including passing DCF audits and inspections. B.G. told agents that he knew KENNETH CHATMAN was the true owner of JOURNEY and REFLECTIONS, but KENNETH CHATMAN would not have been able to pass the background check.  KENNETH CHATMAN instructed B.G. to list LAURA CHATMAN as the owner of both entities.  B.G. was paid approximately $20,000-$25,000 by KENNETH CHATMAN for his work on assisting JOURNEY and REFLECTIONS in successfully gaining DCF licensure.

77.     On or about April 15, 2015, LAURA CHATMAN, with the assistance of B.G. and at the direction of KENNETH CHATMAN, prepared and filed a DCF licensure application for REFLECTIONS wherein she described herself as the sole owner, CEO, and CFO of REFLECTIONS.   The application and supporting documentation failed to disclosed that KENNETH CHATMAN owned and operated REFLECTIONS.  In fact, the Organizational Chart that LAURA CHATMAN submitted did not even contain KENNETH CHATMAN's name, although he was responsible for employee hiring and firing, patient admission and discharge decisions, and all financial decisions at REFLECTIONS.

78.     On or about September 23, 2016, LAURA CHATMAN, with the assistance of B.G. and at the direction of KENNETH CHATMAN, prepared and filed a DCF licensure application for JOURNEY wherein she described herself as the sole owner, CEO, and CFO of JOURNEY.

The application and supporting documentation failed to disclosed that KENNETH CHATMAN owned and operated JOURNEY.  In fact, the Organizational Chart that LAURA CHATMAN submitted did not even contain KENNETH CHATMAN's name, although he was responsible for employee hiring and firing, patient admission and discharge decisions, and all financial decisions at JOURNEY.  DCF further sent a letter to LAURA CHATMAN asking her to confirm that she was the "sole" owner of JOURNEY as represented in her application.  LAURA CHATMAN submitted a letter to DCF reconfirming that she was, in fact, the "sole owner" of JOURNEY.

79.     KENNETH CHATMAN would not have passed the background screening process per the Marchman Act as he has a felony conviction for Access Device Fraud (Title 18 U.S.C §1029).  Without a DCF license, KENNETH CHATMAN would not be able to bill the Insurance Plans for treatment and bodily fluid testing done at the SUBJECT FACILITIES.  Accordingly, the false statements and omissions on the DCF applications were material and made in connection with the delivery of or payment for health care benefits, items, or services.

80.     In addition to the consulting work, B.G. served as the clinical director at REFLECTIONS and later held the same position at JOURNEY.  B.G. stated that the SUBJECT FACILITIES' urine tests are "absolutely worthless."  The test results were not reviewed by a doctor in a timely manner, sometimes up to nine months after the test and after the patient had been discharged from the facility.  B.G. also described how, on occasion, he had recommended that some relapsed patients should be referred for inpatient detox or some other type of care that could help the patients reach sobriety.  Although KENNETH CHATMAN had no medical or clinical training, KENNETH CHATMAN overruled B.G.'s conclusions because a transfer to another facility would mean the SUBJECT FACILITIES could no longer bill the patients' insurance plans.

81.     B.G. also related to agents that KENNETH CHATMAN wanted blood tests, including allergy and HIV testing, run on patients, and instructed medical director DONALD WILLEMS to order the tests, which WILLEMS did.  B.G. said that the reason for performing the additional testing was to increase kickback payments and bribes that KENNETH CHATMAN received from the labs conducting the testing.

82.     B.G. informed agents that KENNETH CHATMAN began bringing more patients to JOURNEY when it attained DCF licensure from the State in 2016 and that the testing and treatment at JOURNEY, including KENNETH CHATMAN's role, is the same as at REFLECTIONS.  Surveillance conducted by agents has confirmed that patients are frequently being picked up at sober homes and dropped off at JOURNEY for treatment.

## CONCLUSION

83.     I submit that this affidavit sets forth sufficient facts to establish probable cause to believe that, from at least as early as September 2013 through December 2016, in Palm Beach and Broward Counties, in the Southern District of Florida, KENNETH CHATMAN, JOAQUIN MENDEZ, DONALD WILLEMS, FRANCINE DAVIS, MICHAEL BONDS, and LAURA CHATMAN, and persons known and unknown, conspired to commit health care fraud, that is, to knowingly and willfully execute, or attempt to execute, a scheme or artifice to defraud any health care benefit program or to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program, in connection with the delivery of or payment for health care benefits, items, or services, in violation of Title 18, United States Code, Section 1347; all in violation of Title 18, United States Code, Section 1349.

84.     I further submit that this affidavit sets forth sufficient facts to establish probable cause to believe that, on or about April 15, 2015 and September 23, 2016, in Palm Beach and Broward Counties, in the Southern District of Florida, KENNETH CHATMAN and LAURA CHATMAN, in matters involving health care benefit programs, knowingly and willfully falsified, concealed, and covered up by a trick, scheme, and device a material fact in connection with the delivery of health care services, that is, in applications for licensure and supporting documentation, the defendants listed Laura Chatman as the sole owner of REFLECTIONS and JOURNEY, and failed to disclose that Kenneth Chatman, a convicted felon, was an owner and director of REFLECTIONS and JOURNEY, in connection with obtaining licenses from the Florida Department of Children and Families authorizing REFLECTIONS and JOURNEY to provide substance abuse services; in violation of Title 18, United States Code, Sections 1035(a)(1) and 2.

FURTHER YOUR AFFIANT SAYETH NAUGHT.

_____
Special Agent John Gerrity
Federal Bureau of Investigation

Subscribed and sworn to before me
this 20 day of December, 2016

_William Matthewman_
WILLIAM MATTHEWMAN
UNITED STATES MAGISTRATE JUDGE

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

### No.   16-8462-WM

**UNITED STATES OF AMERICA**

**vs.**

**SEALED CRIMINAL COMPLAINT**

### Defendant.

_____/

## CRIMINAL COVER SHEET

1.    Did this matter originate from a matter pending in the Northern Region of the United States Attorney's Office prior to October 14, 2003?  _____ Yes  __X__ No

2.    Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to September 1, 2007?  _____ Yes  __X__ No

Respectfully submitted,

WIFREDO A. FERRER
UNITED STATES ATTORNEY

BY:  _____

A. MARIE VILLAFAÑA
ASSISTANT UNITED STATES ATTORNEY
Florida Bar No. 0018255
500 S. Australian Avenue, Suite 400
West Palm Beach, FL 33401-6235
Tel:  (561) 820-8711
Fax: (561) 820-8777
Ann.Marie.C.Villafaña@usdoj.gov